## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: Carol Ann Harkin, | ) | Bankruptcy No. 16-B-80220 |
| | ) | |
| Debtor. | ) | Adversary No. 16-A-96028 |
| Wanda J. Argyle, | ) | |
| Plaintiff, | ) | Chapter 7 |
| v. | ) | |
| Carol Ann Harkin, | ) | Judge Lynch |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OPINION

Involving the dischargeability of a loan made between friends, this case brings to mind the advice of Polonius to "[n]either a borrower nor a lender be; for loan oft loses both itself and friend." HAMLET act 1, sc. 3. In this case Carol Harkin sought to refinance a mortgage loan on two rental properties she owned. In an effort to avoid the closing costs and other charges a bank would impose, Ms. Harkin approached Wanda Argyle, her friend and former employee, for the funds. The parties each had years of experience as realtors, but claimed to have little or no personal experience in drafting legal documents or perfecting security. In return for the loan Ms. Harkin granted Ms. Argyle mortgages in the two properties. The present dispute arises from the failure to timely record these mortgages.

Ms. Harkin made interest payments on the loan for a while, but she eventually defaulted on the loan and filed for bankruptcy protection. By the time the mortgages were recorded, more than two years after the original loan, Ms. Harkin had again borrowed on the rental properties and had granted additional mortgages to another

lender.

Ms. Argyle asks this court to determine the remaining amount owing on the loan to be nondischargeable under Section 523(a) of the Bankruptcy Code. Ms. Argyle accuses Ms. Harkin in principal part of making false pretenses at the time of the loan that her mortgage would be a "first mortgage" and of defrauding her by taking advantage of Ms. Argyle's failure to record the mortgage when Ms. Harkin granted mortgages in the same two properties to secure a new bank loan seven months later. For the reasons discussed below, the court finds that Ms. Argyle has not met her burden to except the debt from discharge under Section 523(a).

## JURISDICTION AND PROCEDURE

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The Plaintiff seeks a finding that under Section 523(a)(2) and (a)(4) of the Bankruptcy Code the debt owed to her is not subject to the discharge granted pursuant to Section 727(a) of the Bankruptcy Code.[1] It is therefore a matter arising under title 11 and is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I). Because matters such as this "stem [] from the bankruptcy itself," this court has constitutional and statutory authority to enter a final order in this proceeding. *Stern v. Marshall*, 546 U.S. 500 (2011). The parties also stipulated on the record that they each consent to this matter being heard and finally determined

---

[1] The Adversary Complaint also initially sought to deny the Debtor a discharge pursuant to Sections 727(a)(4) and (a)(5) of the Bankruptcy Code. The Plaintiff subsequently voluntarily dismissed the counts brought under Section 727(a) by order entered February 27, 2017. (ECF No. 38.)

by this court. (ECF No. 26.)

## FINDINGS OF FACT[2]

The Debtor, Carol Harkin, is a real estate broker with almost 50 years' experience. The Plaintiff, Wanda Argyle, has known the Debtor since the 1980's. Over the years they became close friends. The Plaintiff worked as a realtor from 1982 until around 1992, working for at least a portion of that time as an employee for the Debtor, before moving on to other careers. The two remained friends. Both have been members of an investment club since 2007 where they learned how to make investments. During their careers in real estate they each attended numerous real estate closings and were generally familiar with mortgages, deeds and promissory notes. However, the Plaintiff testified that at such closings, a title company representative or attorneys were always in charge of preparing such legal documents and the Plaintiff claimed that she did not handle them directly.

In 2007, the Plaintiff received money from settlement of a legal action. On the advice of an attorney she used the money to form the Wanda Argyle Declaration of Trust dated July 25, 2007 (the "Argyle Trust"), of which the Plaintiff was trustee. She used the Argyle Trust to make at least three secured loans before the loans now at issue. In July 2009, the Argyle Trust loaned the Debtor $210,000, secured by mortgages in properties owned by the Debtor in Wisconsin and in Rockton, Illinois. In December 2009, the Argyle Trust loaned the Plaintiff's daughter $64,167.72

---

2 The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

secured by real estate in Moline, Illinois.  In 2012, the Argyle Trust loaned the Plaintiff's son $6,000, secured by a car.  The loan to the Plaintiff's son did not accrue interest, but the other two loans did.

It is undisputed that the Debtor repaid the 2009 loan from the Argyle Trust in full.  The Debtor paid the Plaintiff around $100,000 out of the proceeds of the sale of the Wisconsin property in 2009.  On or about May 30, 2014, she paid the remaining $110,723.29 out of the proceeds of sale of the Rockton property.  The Plaintiff testified that the Wisconsin property had sold in 2009 for more than $100,000, but that the Plaintiff did not ask for more to be paid at that time because she "didn't want to do anything that would harm [the Debtor] at all, and I was earning good interest on that money, so I didn't." (Trial Tr. 51:19-21, Jan. 24, 2017, ECF No. 36.)

In late March or early April 2011, Plaintiff's companion of many years was placed in intensive care shortly after being admitted to the hospital.  His condition worsened and he died on April 6, 2011.

Around the same time, the Debtor approached the Plaintiff with a business proposition.  As the Plaintiff described it, the Debtor "gave me a piece of paper, offering me a way to earn some interest on some money I'd been trying to invest."[3] (Trial Tr. 23:12-14.)  The Plaintiff testified that the Debtor told her "she had these two properties she had to refinance" and suggested that if the Plaintiff lent her the money the Debtor would pay her interest on the loan and the Debtor could save on closing costs and other fees she would otherwise incur through a bank refinancing.

---

[3] The Plaintiff did not testify further about the alleged paper nor offered it into evidence.

(Trial Tr. 25:16-17.) According to the Plaintiff, the proposition "sounded okay to me." The properties involved were the Debtor's rental properties located in South Beloit, Illinois (the "Gardner St. Property") and in Machesney Park, Illinois (the "Greenview Property"). At the time the two properties secured a loan the Debtor obtained from Blackhawk Bank.

The Plaintiff met the Debtor at the Debtor's office on April 13, 2011 to finalize the documents for the loan. During the meeting the Plaintiff, as trustee of the Argyle Trust, agreed to lend the Debtor $90,000. The Plaintiff testified that the Debtor promised that the Plaintiff "would be the first lienholder on the two properties" presenting her with tax assessments and other items "showing [] that the properties were worth well over $100,000." (Trial Tr. 27:1-5.) The Debtor and the Plaintiff both signed a promissory note for the $90,000 loan dated April 13, 2011 which provided that the Debtor would make monthly interest-only payments at 8% APR. The note had a three-year term. On the same day, the Debtor also gave the Plaintiff, as trustee of the Argyle Trust, a signed mortgage on the Gardner St. and Greenview Properties to secure the promissory note.[4] The mortgage and the promissory note were notarized by Ms. Argyle's secretary, who made copies. The originals were placed in a folder that was given to the Plaintiff. (Tr. 32:13-22; 87:6-8.)

Neither the promissory note nor the mortgage contain any covenants against incurring future debts or encumbrances. Nor do either make any representations or

---

[4] On April 13, 2011, the Debtor also changed the beneficiary designation on her life insurance policy to the Argyle Trust, listing the trust as "LEIN [sic] HOLDER." There was no testimony that the Debtor had agreed to do so or that the Plaintiff was even aware of the change in designation at the time.

warranties as to the non-existence of other encumbrances. To the contrary, the mortgage contemplates the possibility of other liens, stating that the Debtor agreed to pay promptly when due "all liens on said premises including all installments of interest and principal on said prior lien as they mature."[5] The Plaintiff admits that she did not conduct a title search as of the time of the loan and testified that she could not recall if the Debtor showed her any documentation which might have included a title search. While on the stand the Plaintiff stated being, in her own words, "probably not in my right mind at the time" when she made the loan due to the shock of her companion's recent death. (Trial Tr. 26:16-18.) She further admitted that she "wasn't thinking clearly" and "shouldn't have been doing anything like this at that time." (Trial Tr. 33:24-34:2.) However, the testimony of the parties failed to demonstrate that the Debtor was aware that the Plaintiff was not thinking clearly or that she consciously took advantage of the Plaintiff's mental state. Instead, the Plaintiff's state of mind simply explains why the Plaintiff failed to take proper steps to perfect her security interest. The Plaintiff testified that she did not record the mortgage immediately after the transaction because "my mind was in a hundred different places" and "I was probably somewhat in a state of shock, and still, you know, a week after his death, and we were trying to plan a memorial." (Trial Tr. 33:8-17.) The Plaintiff testified that at the end of the meeting on April 13, 2011, the Debtor gave her a white folder with the note, mortgage and other documents, but admitted

---

[5] The record is unclear who drafted the note and promissory note. The Plaintiff testified that she did not draft them and had assumed that the Debtor drafted them. (Trial Tr. 31:23-24.) It is unclear from the record, however, whether the Debtor in fact drafted them herself or if she had the assistance of counsel.

that she did not "even really recall looking at that – what was in that folder." (Trial Tr. 27:15-17.) The Plaintiff testified that the Debtor told her at that time "something like don't worry about anything, I know you are under a lot of stress right now." (Trial Tr. 27:16-19.) However, the Plaintiff also testified that "during this transaction" she "did not ... recall" the Debtor "tell[ing her] anything regarding the documents" or "tell[ing her] to do anything" or "giv[ing her] any assurances" other than that she "would have the first lien on those two properties; not to worry about anything." (Trial Tr. 28:25 -29:9.) The Plaintiff testified that she was "sure I went home and put" the package of documents she had been given "in my drawer with other stuff that I had and never looked at it again." (Trial Tr. 28:15-16.)

The Plaintiff testified that on April 13, 2011 the Debtor verbally "assured me that I would be in the first place as lienholder" in the two properties. (Trial Tr. 27:7-8.) The Debtor does not dispute making such a representation, but states that the Plaintiff was in fact granted a first mortgage. Although at the time of the loan the two properties were encumbered by a loan and mortgage granted to Blackhawk Bank, such loan was the loan that the Debtor was refinancing. The Plaintiff was aware that the purpose of her loan was to repay the Blackhawk loan. Moreover, the Debtor in fact used the proceeds to repay it. Nor is there any evidence that the Plaintiff was materially harmed by the existence of the Blackhawk mortgages. The uncontroverted evidence showed that the Debtor paid the full balance of $53,701.38 to Blackhawk Bank on or about April 19, 2011, and that Blackhawk filed releases of the mortgages on the two properties, dated July 21, 2011 and recorded on August 16, 2011.

Both the Debtor and the Plaintiff testified that the Debtor made all required interest payments on the 2011 loan to the Plaintiff until the expiration of the loan in April 2014. (Trial Tr. 37:22-23, 56:11-16, 91:4-19.) In the meantime, however, the Debtor incurred a new debt to Gateway Community Bank in December 2011. The Debtor testified that as of December 2011 she was indebted to Gateway Community Bank on a pre-existing loan or loans secured by other property she had, including the Rockton property, a Chevy Tahoe and another property that she owned in South Beloit. (Trial Tr. 89:17-90:2.) The Debtor testified that she owed $38,000 in property taxes for 2010 on these other properties and sought to borrow from Gateway to pay the taxes. (Trial Tr. 88:14-17.) The Debtor testified that she initially "asked for a second mortgage on [the property in South Beloit b]ecause I had over $80,000 equity in that property." (Trial Tr. 87:20-22.) She testified that after meeting with his superiors, the loan officer "said, we can't – we're not going to use [the South Beloit property] but we'll put a mortgage on those two houses." (Trial Tr. 90:10-12.) The Debtor testified that she "assumed it was a second mortgage" and was not surprised that they were willing to accept a second mortgage in additional property because otherwise "they'd have to pay those taxes, so I figured they were happy to have me on the note for them." (Trial Tr. 90:12-15.) Although the loan officer testified at trial that he could not recall such conversation, neither did he deny that it took place. The Debtor testified that nobody "from Gateway Bank ask[ed her] any questions about [her] assets or [her] liabilities." (Trial Tr. 89:17-20.)

At trial, the Plaintiff proffered a portion of a document entitled "Business Loan

Presentation" prepared by an unknown person at Gateway Community Bank, which described the Gardner Street and Greenview Properties as owned "free and clear."[6] Although the Debtor stipulated before trial to the admissibility of this exhibit, the court gives it little weight. The Plaintiff's only witness at trial from the bank testified that he did not prepare the document. (Trial Tr. 16:5-9.) Rather, he testified that the document was prepared "by the sales associates that work for us" and that he was not sure "with any recollection" as to who the sales associate at the time was. (Trial Tr. 15:9-11, 16:5-9.) He further characterized the document as "just a breakdown of the summary."[7] (Trial Tr. 20:24-25.)

The loan officer from Gateway Community Bank testified that he believed the bank would not have approved the loan had it known about the loan and mortgage to the Plaintiff or, in his words, at "the very least, it would have needed to be paid off." (Trial Tr. 14:8-9.) However, no evidence was presented that the Debtor actually made any representation to the bank that the property was free and clear. The loan officer testified to no such representation by the Debtor to him, either verbally or in writing, and the Debtor denied making any such representation. The Debtor testified without contravention that she had never seen the internal "Business Loan Presentation." (Trial Tr. 89:8-14.) She also testified without contravention that she did not "participate in helping somebody fill out this business loan presentation." (Trial Tr.

---

[6] The Plaintiff's witness admitted that the proffered exhibit did not include pages 2 or 3 of the "complete document." (Trial Tr. 15:4-7.)

[7] While the Debtor did not object at trial to the apparent hearsay (indeed, multiple hearsay) content of this document, the court will note that the foundation testimony offered by the Plaintiff's witness fell short of making the threshold showing that it falls within the Records of a Regularly Conducted Activity exception to the hearsay rule. Fed. R. Evid. 803(6). *See In re Hudson*, 504 B.R. 569, 571-77 (B.A.P. 9th Cir. 2014).

90:3-5.) She did sign a "Business Purpose Statement" dated December 15, 2011, but that document merely stated that she intended to use to the proceeds of the $45,000 loan from Gateway in part to pay 2010 property taxes. (Pl.'s Ex. 3.) No evidence was presented to suggest that she used the funds for any other purpose.

The "Business Purpose Statement" did not specifically refer to any collateral. Nor did either the note or the mortgage to Gateway Community Bank contain any representations or warranties as to prior debts or encumbrances or covenants not to incur additional debt. It appears that the bank simply assumed on the basis of their own title search that the properties were free and clear. But no evidence was presented to show that the Debtor was aware of such search or was asked about prior indebtedness. To the contrary, the Debtor testified that she was unaware that the Plaintiff had failed to record her mortgages.

On December 15, 2011, Gateway Community Bank lent the Debtor $45,000. In exchange, the Debtor signed a promissory note, promising to repay the loan at 6.0% APR, in monthly payments of principal and interest with a balloon payment due on December 15, 2014. On the same date the note was signed, the Debtor granted Gateway Community Bank mortgages in the Gardner St. and Greenview Properties to secure both the new debt and all other existing and future indebtedness of the Debtor to Gateway. Gateway recorded its mortgages on December 20, 2011. The loan officer at Gateway testified that it would be against the bank's policies and procedures to rely on a borrower to record a mortgage.

The Plaintiff apparently did not give a second thought about the July 2011 loan

until sometime in 2013, when she alleges that she first learned that her mortgage was unrecorded. The Plaintiff testified that in April or May 2013 she somehow learned that certain property taxes had not been paid. She alleges that when she contacted the recorders' office to learn more about the taxes she realized and discovered that her mortgage had never been recorded and that there was a subsequent lien. (Trial Tr. 35:18-36:25.) The Plaintiff testified that she met with the Debtor shortly thereafter and discussed what had happened. The Plaintiff described the meeting, testifying that: "we met, we talked about this. [The Debtor] apologized. We were in tears. We were both hugging, it was a, you know, a best friend type meeting, like, what happened type, trying to understand." (Trial Tr. 49:24-50:2.) They discussed how the Debtor would repay the loan to the Plaintiff. Specifically, the Debtor indicated to the Plaintiff that she had placed her Rockton, Illinois property for sale and hoped based on the then-current asking price to receive about $45,000 in excess proceeds. (Trial Tr. 50:5-8.) The Debtor also stated that she hoped to earn another $45,000 in one year upon the expiration of a lease at the Debtor's South Beloit property if the tenant exercised a purchase option. (Trial Tr. 50:11-17.) The Plaintiff testified that as of that time, she had "everything in front of me telling me [the Debtor's] intentions were good; and all those things were feasible." (Trial Tr. 50:20-21.) The Plaintiff did not present any evidence that the Debtor made any misrepresentations at this time, instead testifying only that the Debtor's hopes did not come to fruition. The Plaintiff testified that "it was in January 2014 that I realized that things hadn't happened quite like that. The lease option expired

worthless. The [Rockton property] still hadn't sold yet. It wasn't looking too good."
(Trial Tr. 50:22-25.)

In January 2014, the Plaintiff retained counsel to assist her in recording the April 2011 mortgages. The Plaintiff testified that before recording it, her counsel added language indicating that the Debtor had prepared the mortgage. The Plaintiff admitted at trial that she did not in fact know who had drafted the mortgage and had merely assumed it to be the Debtor. (Trial Tr. 31:22-24.) The mortgage was recorded on January 29, 2014.

The Debtor timely made all required interest payments to the Plaintiff as required by the terms of the promissory note but failed to repay the outstanding balance when it became due in full on April 13, 2014. In July 2014, the Plaintiff obtained new counsel and met with him and with the Debtor to discuss repayment of the 2011 note. The Plaintiff's attorney drafted a new promissory note for $90,000 from the Debtor in favor of the Argyle Trust, which the Debtor signed on July 26, 2014. The Plaintiff testified that the purpose of the 2014 note was "because the three year contract that we originally had, the lending of the $90,000, expired in April of 2014. And she stopped making interest payments to me. Up until then, she'd always paid them." (Trial Tr. 37:18-23.)

The 2014 note stated that the earlier note was in default, with $90,000.00 in principal still owing. The note stated that, "the parties are desirable to settle WANDA'S claim against CAROL without litigation" and therefore "enter into a new note." The new note provided for repayment of a principal amount of $90,000 without

interest, with an option to satisfy the note by payment of $80,000 within four years. It provided for minimum payments of $1,000 per month, but the Debtor "promise[d] to put forth her best effort to make payments above the minimum." If the Debtor failed to make payments averaging $1,500 per month over any twelve-month period, the minimum monthly payment was to increase to $1,500. If the Debtor defaulted on monthly payments after notice the Plaintiff could accelerate the debt. Finally, it provided that the 2014 "Note will continue to be secured by a mortgage to holder as set forth in the parties original Note on April 13, 2011, on [the Gardner St. and Greenview Properties.]"

At some point thereafter, the Debtor apparently defaulted on the terms of the 2014 Note. In 2014, the Debtor found a purchaser for the Gardner St. Property for approximately $35,000. The Plaintiff agreed to sign a release of her mortgage on October 27, 2014 and recorded October 29, 2014 in exchange for $5,000 from the sale proceeds to be applied against the debt to the Argyle Trust. The Plaintiff testified that the Debtor was several months behind on the 2014 Note at that time and that she applied the $5,000 in proceeds to the arrearage. (Trial Tr. 55:23-56:5, 62:4-7.) The Plaintiff testified that the Debtor received about $3,000 of the sale proceeds and the remainder was paid to Gateway Community Bank. (Trial Tr. 62:2-3.)

On September 24, 2015, the Plaintiff filed a two-count complaint against the Debtor in the circuit court in Winnebago County, Illinois, alleging breach of contract and fraud. The state court complaint asserted that as of the date of the complaint, "[a]fter accounting for all credits, there remains due and owing to Plaintiff from

Defendant the principal sum of $81,500.00." The Debtor, acting without counsel, filed an answer to the complaint on October 29, 2015, denying several factual allegations.

The Debtor filed her Chapter 7 petition with this court on February 1, 2016. She scheduled both Gateway Community Bank and the Argyle Trust as creditors holding claims secured by the Greenview Property. In her Statement of Financial Affairs, she disclosed the pre-petition sales of the Gardner St., Rockton and South Beloit properties.

Gateway Community Bank sought relief from the automatic stay on March 2, 2016 to commence a foreclosure action on the Greenview Property. The motion was granted on March 16, 2016, and the bank apparently filed a foreclosure action thereafter, naming the Debtor and the Argyle Trust as defendants. A foreclosure judgment was entered and the Greenview Property was sold in a judicial sale to Gateway Community Bank pursuant to an order confirming sale entered on September 15, 2016, with a sheriff's deed recorded September 29, 2016. The Plaintiff testified that she received no proceeds from the sale of the Greenview Property.

The only asset of the estate which the Chapter 7 trustee administered was the Debtor's half-interest in a vacant lot in Roscoe, Illinois. The trustee sold the lot for a gross sale price of $24,500 pursuant to this court's order entered May 23, 2016, with the estate receiving half that amount. The Argyle Trust filed a proof of claim in the bankruptcy case on June 24, 2016 for $81,500. The Plaintiff received a distribution from the bankruptcy estate of $5,996.27 on or about September 27, 2016. The trustee filed a final report on December 8, 2016.

The Plaintiff filed this adversary complaint on May 16, 2016, objecting to the Debtor's discharge pursuant to several subsections of Section 727(a), and seeking a determination that the debt owed her is non-dischargeable under Section 523(a)(2) or (a)(4). A trial was held on January 24, 2017. At trial, the Plaintiff indicated that she did not want to proceed on her Section 727(a) counts objecting to discharge. After due notice, the Section 727(a) counts were dismissed on February 27, 2017 on the motion of the Plaintiff. The Debtor was granted a discharge on the same date, and the bankruptcy case closed on March 2, 2017.

At the close of the Plaintiff's case in chief on January 24, 2017, the Defendant moved for judgment on partial findings pursuant to Fed. R. Bankr. P. 7052. For the reasons stated by the court on the record, the court granted that motion in part and denied it in part. The court found that the Plaintiff had failed to provide any evidence of a statement in writing that was materially false respecting the Debtor's or an insider's financial condition. The court therefore directed judgment in favor of the Debtor to the extent the Plaintiff brought a claim pursuant to Section 523(a)(2)(B).

In addition, the court found that the Plaintiff had failed to meet her burden under Section 523(a)(4). The operative term for the latter subsection in this case, "fiduciary capacity", is "strict and narrow" and "encompasses only 'a subset' of fiduciary obligations." *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 767-68 (7th Cir. 2011) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)). For purposes of Section 523(a)(4), such a relationship "may arise when there is either an express trust or 'a difference in knowledge or power between fiduciary

and principal which . . . gives the former a position of ascendancy over the latter. *Galloni v. Barry (In re Barry)*, 538 B.R. 739, 748 (Bankr. N.D. Ill. 2015) (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994)) (original ellipses). Additionally, for "a section 523(a)(4) exception to apply, the fiduciary duties must exist prior to the debt." *In re Berman*, 629 F.3d at 769. It is unclear upon what basis the Plaintiff asserts that the Debtor acted in a fiduciary capacity towards the Plaintiff. Other than citing 11 U.S.C. § 523(a)(4) as one of several bases for the complaint, the complaint makes no reference to any "fiduciary relationship" or "fiduciary capacity." The complaint alleges that the Debtor "was a real estate broker," but based on the testimony received at trial, it is clear that the Debtor – who was the borrower in the transaction – was not acting as a broker on behalf of the Plaintiff, who was herself a former real estate broker. To be sure the Plaintiff testified that as a friend and former boss the Debtor "was like a mother" to her and that the Plaintiff "trusted her." The Plaintiff, however, put on no evidence by the close of her case that established the existence of a fiduciary capacity. Indeed, as for any imbalance of power or information, the Plaintiff seemed to point only to the Debtor's knowledge of or ability to record the mortgage. But, the recording of a mortgage is a matter of public record and the Plaintiff had equal if not greater ability to record the mortgage, since she was given the original instruments.

The court denied the Debtor's Rule 7052 motion with respect to the Plaintiff's claim under Section 523(a)(2)(A) and provided the Debtor the opportunity to present evidence in her defense on that claim.

## DISCUSSION

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

### The Significance of the July 2014 Note.

The court will first consider the Debtor's argument raised at trial that the debt the Plaintiff actually seeks to except from discharge arises solely out of the July 2014 Note for which, the Debtor contends, the Plaintiff failed to allege or prove any related fraud or misrepresentation. The Plaintiff admitted at trial that by July 2014 she was well aware of the mortgage granted to and recorded by Gateway Community Bank. Indeed, the Plaintiff does not allege that the Debtor made any false representations in connection with the 2014 Note. Based on that, the Debtor essentially argues that the July 2014 Note extinguished any prior indebtedness, thereby also extinguishing any claim of fraud relating to the 2011 loan for purposes of Section 523(a)(2)(A).

Precedent does not support this argument. In *Archer v. Warner*, the Supreme Court held that, even if a settlement agreement and release with respect to a fraudulently obtained debt "worked a kind of novation ... that fact does not bar the [creditor] from showing that the settlement debt arose out of 'false pretenses, a false representation, or actual fraud,' and consequently is nondischargeable." 538 U.S. 314, 323 (2003). The settlement of a fraud claim did not "sever[] the causal relationship" between a "liquidated debt and underlying fraud." 538 U.S. at 320. The Court noted

that "Congress intended the fullest possible inquiry to ensure that all debts arising out of fraud are excepted from discharge, no matter what their form." 538 U.S. at 321 (internal quotation marks omitted). Thus, the Court concluded that "the mere fact that a conscientious creditor has previously reduced his claim to [settlement] should not bar further inquiry into the true nature of the debt." *Id. See also Giamo v. DeTrano (In re DeTrano)*, 326 F.3d 319, 322 (2d Cir. 2003) (Sotomayor, J.) ("[I]f the tort claims against DeTrano would have created a nondischargeable debt under §523(a)(4), had those claims been litigated to judgment in Giaimo's favor, then it is no defense for DeTrano to state that he has replaced that possible liability with a dischargeable contractual obligation through the settlement agreement.").

The parties here dispute whether the July 2014 Note is a "settlement agreement." On the one hand, one of the precursory recitals, a "whereas" clause found at the beginning of the 2014 Note, recites that the parties are "desirable to settle [the Plaintiffs] claim against [the Debtor] without litigation." But under Illinois contract law, "a recital is merely an explanation of the circumstances surrounding the execution of the contract, but is not a binding obligation referred to in the operative portion of the contract." *Regnery v. Meyers*, 679 N.E.2d 74, 78 (Ill. App. Ct. 1997). In that case the court determined that a consent agreement relating to the issuance of company stock does not constitute a release of a plaintiff's claims relating to the purchase of the stock where "the words 'I release' or 'we release' are not found within the agreement" and does not "clearly and unequivocally state that plaintiffs released such claims against defendants." *Id.* Here, neither the title of the instrument nor its

operative provisions designate a settlement or contain any terms about the compromise and release of any particular claim. And as the Court found in *Archer*, that "what has not been established here ... is that the parties meant to resolve the issue of fraud or, more narrowly, to resolve that issue for purposes of a later claim of nondischargeability in bankruptcy." *Id.* at 322.

But while skeptical of the Debtor's argument, the court need not determine whether the ruling in *Archer* is limited to settlement agreements or whether the 2014 Note constitutes a "settlement agreement" because, for the reasons discussed below, the Plaintiff has not met her burden of proving the pre-2014 debts arose out of false pretenses, a false representation, or actual fraud.

<u>False Pretense or False Representation.</u>

False pretense and false representation are similar, except that the latter involves express representations while the former more often involves omissions or implied representations. A false pretense "involves an implied misrepresentation or conduct that is intended to create and foster a false impression, while a false representation involves an express representation." *In re Scarlata*, 127 B.R. 1004, 1009 (N.D. Ill. 1991). Where a claim under Section 523(a)(2)(A) is based on false pretenses or a false representation, the plaintiff must demonstrate by the preponderance of the evidence that "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010). An

omission is material where "the circumstances imply a specific set of facts and disclosure [of that fact] is necessary to correct what would otherwise be a false impression." *In re Fenner*, 558 B.R. 877, 884 (Bankr. N.D. Ill. 2016) (quoting *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009)).

Justifiable reliance "is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" 599 F.3d at 717 (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)). Under this standard, "a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent." *Id.* The standard is not an objective one," but rather "is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*

In her adversary complaint, the Plaintiff alleges that the Debtor made three false misrepresentations at the time of the April 2011 loan: 1) that the Plaintiff "would be guaranteed to received [sic] her investment back plus interest"; 2) that the Plaintiff "would be fully secured as a first lien mortgage holder on the properties"; and 3) that the Debtor "would take care of all paperwork."

As to the first allegation, the credible evidence fails to demonstrate that the statement was made. At trial the Plaintiff failed to present any testimony or other evidence that the Debtor had stated that she "guaranteed" repayment of the loan. In any event, the alleged guaranty as Plaintiff herself describes it is no more than a borrower's promise of future performance. Because the Section 523(a)(2)(A) exception

to dischargeability "was intended to encompass fraud and not simply breach of contract, [a] promise constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it." *Sullivan v. Ratz*, 551 B.R. 338, 346 (N.D. Ill. 2016) (internal citation and quotation marks omitted). *See also Reeves v. Davis (In re Davis)*, 638 F.3d 549, 554 (7th Cir. 2011) ("failure to honor one's promise is (just) breach of contract, but making a promise that one *intends* not to keep is fraud") (quoting *U.S. ex re. Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005)). Here, the Plaintiff failed to prove that at the time the Debtor entered into the April 2011 loan agreement she intended not to repay it. On the contrary, it is undisputed that the Debtor made timely monthly interest payments for the full initial 3-year term of the note. Although the Debtor failed to repay the principal in full when it came due, the evidence shows that she did make subsequent efforts to repay it before ultimately filing for bankruptcy protection.

As to the second alleged misrepresentation, the Debtor conceded at trial that she told the Plaintiff that the Plaintiff would have a first mortgage in the Gardner St. and Greenview Properties. But the Debtor also testified credibly that it was her intent at the time for the Plaintiff to have first mortgages in the two properties. Indeed, had the Plaintiff recorded the mortgages she was given, as she was authorized to do, the Plaintiff would have ultimately obtained a first mortgage in the two properties to secure her debt. True, because of the pre-existing mortgages to Blackhawk Bank, the Plaintiff would not have immediately had a first priority mortgage. But the evidence presented at trial shows that the Plaintiff was aware of

the prior mortgages – or that at least the Debtor reasonably believed the Plaintiff was aware. The Plaintiff admitted at trial that before she made the 2011 loan, the Debtor told her the purpose of the loan was to "refinance [the] two properties.". (Trial Tr. 25:16-17.) The evidence thus shows that the Plaintiff was therefore aware or given notice that there was an existing debt secured by the two properties. A reasonable person with even the most basic concept of a mortgage and the meaning of refinancing a loan – let alone someone working as a realtor for more than a decade – would have realized that the bank would not likely release its mortgages until it was paid and that the Debtor would not pay the mortgage until she had the funds from the loan from the Plaintiff. If the Debtor already had funds to repay the Blackhawk loans in advance of the loan, then it would not really be a "refinancing" – it would simply be a new loan.

The Plaintiff had years of experience as a realtor attending real estate closings, and the Debtor was aware of her experience. The Plaintiff assumed the risk that, for at least a short period, she would be in a second position by not demanding a closing in which the existing lender participated. Moreover, regardless of the Plaintiff's actual knowledge or understanding, she failed to demonstrate that the Debtor intended to deceive her in this respect. To the contrary, the evidence shows that the Debtor in fact used the loan proceeds to pay off Blackhawk Bank within one week. While Blackhawk apparently did not record a release of the mortgage for another four months, Plaintiff did not present any evidence that she was harmed by the existence of the Blackhawk mortgages for the one week before they were repaid or the four

months before they were released.  It is undisputed that the Blackhawk mortgage loans were paid off and released prior to the Plaintiff taking any enforcement steps. Not only did the Plaintiff not credibly demonstrate that she was not in fact aware or had reason to be aware of the prior mortgages, the weight of the evidence clearly suggests otherwise.

As for the third alleged statement, that the Debtor told the Plaintiff that she "would take care of all paperwork," the only actual statements that the Plaintiff testified to or presented evidence as to in connection with the April 2011 transaction were that the Debtor assured her that she "would have the first lien on those two properties" and told her "not to worry about anything." (Trial Tr. 29:5-7.)  The Plaintiff also testified that at an unspecified time the Debtor told her "she would take care of everything." (Trial Tr. 32:3.)  When asked whether during the transaction the Debtor told her "anything regarding the documents," the Plaintiff testified, "Not that I recall." (Trial Tr. 28:25-29:2.)  But whether the Debtor told the Plaintiff the vague and general statements that she did not need "to worry about anything" or that the Debtor "would take care of everything," or even the unsupported allegation that the Plaintiff told the Debtor she "would take care of all the paperwork," the Plaintiff failed to demonstrate that any of these statements were false representations and not mere misunderstandings.  The Debtor did "take care of all the paperwork" for the transaction by drafting or having someone draft the note and mortgage, all the instruments apparently involved in the loan.  And after these instruments were handed over to the Plaintiff at the closing meeting, the evidence does not show that

the original documents were returned to the Debtor for recording or further action. Nor did the Plaintiff need "to worry" about the pre-existing Blackhawk Bank mortgage, which the Debtor "took care of" by quickly paying it off with the proceeds of the loan from the Plaintiff.

While the Plaintiff now alleges that she believed the Debtor would record the two mortgages, she failed to demonstrate that the Debtor ever promised to do so. To the contrary, the Plaintiff admitted in testimony that the Debtor never made any specific representations concerning the documentation. Nor did the Plaintiff demonstrate that the Debtor made false pretenses that she would record the mortgages.

The weight of the evidence presented indicates that it is more likely that the Plaintiff failed to record the mortgage based on her own mistake or carelessness than any reasonable belief the Debtor would do so. To be sure the Plaintiff testified that the reason she did not record it immediately was because she was in such a confusion and "state of shock" because of Dave's death. (Trial Tr. 33:6-16.) But her understandable state of mind at that moment does not explain how over the following many months she ignored her ten years' experience as a realtor, and made no inquiry let alone took affirmative steps to record the mortgages she was given. The Plaintiff's witness, Rob Gillette of Northwest Bank of Rockford testified that the banks he worked for never left it to a borrower to record a mortgage. Common sense also suggests that a lender demanding a mortgage would not rely on the borrower to properly record it and thereby risk the effectiveness of that security on a mere and at

best vague promise by the borrower.

But even if the Plaintiff did mistakenly or irrationally believe that the Debtor would record the mortgages, she failed to meet her burden of showing that the Debtor intentionally caused that belief through false pretenses.   The Plaintiff's main evidence regarding this involves the Plaintiff's testimony that three years later, in 2014, when she confronted the Debtor after learning the mortgages had never been recorded, the Debtor said, "Oh, I'm sorry, I must have forgot to do it, record the mortgage or whatever." (Trial Tr. 37:12-14.)  However, the Plaintiff's account of the alleged reaction years after the mortgages were allegedly to be recorded does not demonstrate that the Debtor intended to create the false pretense in April 2011. Second, this contention is not consistent with the evidence of the Debtor's actual behavior in April 2011. It is undisputed that the Debtor gave the Plaintiff the original copy of the mortgage in April 2011.  If the Debtor believed she was going to record the mortgage – and especially if she was trying to give the impression that she would record it – why would she give the original copy of the mortgage to the Plaintiff? Indeed, when asked by Plaintiff's counsel on cross-examination about the Plaintiff's lien becoming relegated to "second position" as a result of the mortgages granted to Gateway, the Debtor responded "I did not know that she was in – that she did – had not recorded that mortgage." (Trial Tr. 113:9-10.)

The weight of the credible evidence suggests that the alleged apology was not an admission of wrong-doing, but rather an expression of sympathy.  The Debtor credibly testified that she did not realize that the Plaintiff had never recorded the

mortgage until the Plaintiff confronted her in 2014. Moreover, even if the testimony about the supposed apology is to be accepted at face value, it was an admission of mistake, not fraud.

Accordingly, this court must find that the Plaintiff has failed to demonstrate by the preponderance of the evidence that the Debtor made a false representation or omission, that she knew was false or made with reckless disregard for the truth or that any such representation or omission was made with the intent to deceive in connection with the 2011 debt.

### Actual Fraud.

The Plaintiff's second argument is that the Debtor acted fraudulently in December 2011 when she incurred the subsequent debt from Gateway Community Bank, granting mortgages in the same properties. Although the Plaintiff has not alleged that the Debtor communicated with the Plaintiff in connection with the December 2011 loan or that the Plaintiff was even aware of the loan at the time, the Supreme Court has recently held that the "term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz,* 136 S. Ct. 1581, 1586 (2016). Even before *Husky,* the Seventh Circuit had held that "actual fraud" for purposes of Section 523(a)(2)(A) "is broader than misrepresentation." *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000). Both *Husky* and *McClellan* involved fraudulent transfers. Neither court precisely defined "actual fraud," but both courts found that the term was certainly broad enough to include a transfer of assets with

the actual intent to impair a creditor's ability to collect the debt. 136 S. Ct. at 1586-87 ("Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely."); 217 F.3d at 893-94. However, the statute's use of the term "actual" fraud "stands in contrast to 'implied' fraud or fraud 'in law,' which describe acts of deception that 'may exist without the imputation of bad faith or immorality.'" 136 S. Ct. at 1586 (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878)). Thus, "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Id.* Here, however, the Plaintiff failed to demonstrate by the preponderance of the evidence that the Debtor acted with wrongful intent.

In closing argument, counsel for the Plaintiff described the Plaintiff claim of actual fraud as two possible alternatives. First, the Plaintiff argued that both the loan from the Plaintiff and the loan from Gateway were part of an initial scheme that the Debtor planned from the beginning. As the Plaintiff's counsel described it: "Go out, take money from somebody, promise them something, and then go out to somebody else, take money, and promise them something of the exact same nature. That's what the defendant did." Alternatively, counsel argued, even if the Debtor did not intend to grant the subsequent mortgage at the beginning, it was fraudulent for her to later grant the mortgage to Gateway. As Plaintiff's counsel put it: "Harkin's deceit at Gateway defrauded Argyle. Those – that is the relevant time portion for 523(a)(2)." (Trial Tr. 126 -27.)

The Debtor credibly testified that she did not have fraudulent intent at time of the loan from the Plaintiff or at the time of the loan from Gateway. The Plaintiff

failed to controvert this testimony by the preponderance of the evidence. The Gateway loan was taken out more than seven months after the Plaintiff's 2011 loan. The Plaintiff failed to show how such a long delay is possibly consistent with a fraudulent scheme, particularly where it was within the Plaintiff's control to record the mortgages during this time. As discussed above, the testimony shows that at the time of the loan from the Plaintiff to the Debtor in April 2011, the Debtor signed and gave the Plaintiff the original copies of signed mortgages of the Gardner St. and Greenview Properties. Additionally, the Debtor had apparently received at least one other mortgage loan from the Plaintiff in the past which she paid in full. It is also uncontroverted that the Debtor made periodic payments on the April 2011 loan for three years. Even when she was unable to pay the full remaining balance when the loan came due, the Debtor continued to make attempts to repay. None of such actions are consistent with, let alone demonstrate, a scheme to defraud the Plaintiff.

The Debtor also testified credibly that she had believed the Plaintiff did in fact record both mortgages, and only learned several years after the Gateway loan that the Plaintiff had failed to do so. Despite calling the loan officer as a witness, and apparently after having taken discovery upon Gateway Community Bank in the foreclosure proceeding, the Plaintiff failed to prove that the Debtor hid the existence of the loan from the Plaintiff when taking out the loan from Gateway in December 2011. At most, the Plaintiff presented evidence showing that the bank had *believed* the Gardner St. and Greenview Properties to be owned "free and clear" and not that the Debtor had *misrepresented* them to be so.

While it might seem a bit odd that the bank would not have asked the Debtor more questions about the properties before lending against them, this was not a first-time or isolated transaction. According to the Debtor's uncontroverted testimony, the December 2011 loans were made in a work-out context to enable the Debtor to pay property taxes on collateral securing other loans she owed to Gateway. Because the proceeds of the loan were to be used to preserve the value of other collateral pledged to the bank, the Debtor credibly testified that she was not surprised that the bank would be willing to lend against pre-encumbered collateral. Indeed, the Debtor testified that she had initially asked to borrow against property in which Gateway already had a security interest. She testified that it was the loan officer at Gateway who suggested lending against the Gardner St. and Greenview Properties and that, because it was additional collateral she was not surprised that they did not demand a first mortgage.

The Plaintiff, therefore, failed to show by a preponderance of the evidence that that the Debtor had fraudulent intent either in April 2011 when she borrowed the money from the Plaintiff or in December 2011 when she granted mortgages in the Gardner St. and Greenview Properties to except the 2011 loan from discharge.[8]

---

[8] Because the court finds that the Plaintiff failed to demonstrate fraudulent intent as of December 2011, the court need not determine the extent a debt for such purported fraud was a "debt … for money, property, services, or an extension, renewal, or refinancing of credit .. obtained by … actual fraud." 11 U.S.C. § 523(a)(2)(A). The debtor in *McClellan v. Cantrell* was the *recipient* of a fraudulent transfer, not the *transferor*. 217 F.3d 890 (7th Cir. 2000). In contrast, here, the Plaintiff seems to allege that the Debtor made a fraudulent transfer by granting a mortgage in property in which she had an interest. The Seventh Circuit emphasized in *McClellan* that the "words 'obtained by' go with 'money, property, [or] services,' not with 'debt.'" 217 F.3d at 896. Similarly, in *Husky* the Supreme Court remanded the case "tak[ing] no position" for the lower court to "decide on remand whether the debt to Husky was 'obtained by' Ritz' asset-transfer scheme." 136 S. Ct. at 1589 n.3. Nor has the Plaintiff argued that the debt is non-dischargeable pursuant to Section 523(a)(6). *See, e.g., Borges v. Kirwan*

## CONCLUSION

For the foregoing reasons, the Plaintiff has failed to demonstrate that any debt is excepted from discharge under Section 523(a)(2)(A) of the Bankruptcy Code, and judgment shall be entered in favor of the Debtor/Defendant. A separate judgment order shall be entered giving effect to the determinations reached herein.

DATE: March 31, 2017

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge

---

*(In re Kirwan)*, 558 B.R. 9 (Bankr. D. Mass. 2016) (suggesting that "under certain circumstances, 'a fraudulent transfer based on actual intent to hinder, delay or defraud a creditor can support a [Bankruptcy Code] § 523(a)(6) claim.'" (quoting *In re Jahriling*, 510 B.R. 820, 829 (Bankr. N.D. Ill. 2014) and citing additional cases). *See also, McClellan v. Cantrell*, 217 F.3d at 897-99 (Ripple, J. concurring). Even had Plaintiff asserted a claim under Section 523(a)(6), however, as discussed above she failed to prove that the Debtor had "actual intent to hinder, delay or defraud a creditor" or that she willfully or maliciously injured the Plaintiff's interest in the property. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."). To the contrary, the evidence showed that the Debtor believed at the time that the Plaintiff had recorded her mortgages and that the Gateway mortgages would therefore be subordinated to the Plaintiff's security interest.